UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MAXWELL MCCATTY,<br>　　　　　Plaintiff,<br><br>　　v.<br><br>STALLION EXPRESS, LLC<br>and PHARMSCRIPT LLC,<br>　　　　　Defendants. | CIVIL ACTION<br>NO. 24-10224-MRG |

### REPORT AND RECOMMENDATION

**March 14, 2025**

Hennessy, M.J.

By Order of Reference dated November 5, 2024, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #46), this matter was referred to me for a report and recommendation on Defendant Pharmscript LLC's motion to dismiss (Docket #25). Plaintiff Maxwell McCatty has filed an opposition (Docket #31) to which Pharmscript has replied (Docket #41). Also referred to me for a report and recommendation is McCatty's motion to certify class (Docket #15). Pharmscript and Defendant Stallion Express, LLC have both filed oppositions (Dockets #27 and 29, respectively) to which McCatty has replied (Docket #35). Stallion has also filed a sur-reply to the motion. (Docket #44). These matters are now ripe for adjudication. For the reasons that follow, I RECOMMEND that the motion to dismiss (Docket #25) be ALLOWED and the motion to certify class (Docket #15) be DENIED AS MOOT.

I.　　BACKGROUND

On October 19, 2020, Pharmscript and Stallion entered into a Transportation Services Agreement (the "Services Agreement") pursuant to which Pharmscript engaged Stallion to provide

pharmaceutical courier services for its Massachusetts location.[1, 2]  (Docket #26-2 at 1).  Stallion contracted directly with couriers, including McCatty, to transport pharmaceutical and medical products from the Pharmscript Massachusetts location to their customers.  (Docket #18 at ¶ 21).

The Services Agreement specified that Stallion was an independent contractor, stating:

> This Agreement does not constitute the employment of Stallion by Customer [Pharmscript].  It is the Parties' intention that Stallion is a contract carrier and that the parties to this Agreement are independent contractors and neither shall be deemed to be the agent, representative, partner, joint venture or employer/employee of the other.  Stallion shall be responsible for full payment of all wages, salaries, or other compensation to its employees, as well as for the payment of any applicable payroll taxes, worker's compensation, unemployment, or other taxes, fees or governmental charges related to providing Services.  The Parties understand that the Customer has not [sic] control, right of supervision or termination over Stallion's personnel providing Services under this Agreement.

(Docket #26-2 at 8).

On January 29, 2024, McCatty, who worked as a courier for Stallion until August 2022, (Docket #18 at ¶ 7), filed a putative collective and class action complaint alleging that he was improperly classified as an independent contractor and should have been classified as an employee

---

[1] The Services Agreement provides a description of the courier services which Stallion agreed to undertake:

> Upon request by Customer [Pharmscript], Stallion will facilitate pick-up from each location designated by Customer Shipping Containers (including Return Items), with accompanying delivery receipts, and make delivery to Customer's consignees or Customer location specified on the shipping label at the date and time in accordance with the terms of this agreement.  The delivery services will be provided in a reasonable, efficient, and timely basis in accordance with the instructions, requirements and specifications of the Customer.  Stallion will obtain a signed electronic receipt which shall include the signature of consignee, signature time, and date, and provide same day, delivery of each Return Item to its origin or other Customer location.  Copies of delivery documentation shall be electronically provided to Customer and retained by Stallion.  Stallion shall provide real-time tracking and reporting of pick-up and delivery of each Shipping Container as further provided herein.  Stallion will make standard deliveries by automobile, i.e. vans, cars, and SUVs, and not utilize pick-up trucks or box trucks unless specifically authorized by Customer.

(Docket #26-2 at 3).

[2] Stallion has partnered with Pharmscript to provide delivery services in numerous locations throughout the United States including in Massachusetts, New Hampshire, Rhode Island, New York, New Jersey, Maryland, Connecticut, Virginia, Delaware, and Pennsylvania.  (Docket #18 at ¶ 15).

of both Stallion and Pharmscript. (Docket #1). McCatty filed an amended complaint on March 25, 2024. (Docket #18). The alleged misclassification of McCatty as an independent contractor is the basis of his various wage claims brought under the Fair Labor Standards Act as well as Massachusetts state law. (Id. at ¶¶ 56-59). On March 12, 2025, this court granted Stallion's motion to dismiss and compel individual arbitration. (Docket #47).

II.   STANDARD OF REVIEW

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007). "Under Rule 12(b)(6), the district court may properly consider only facts and documents that are part of or incorporated into the complaint; if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009) (quoting Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008)). There lies an exception to this rule "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Id. (quoting Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001)); see In re Fid. ERISA Fee Litig., 990 F.3d 50, 53-54 (1st Cir. 2021) ("When a complaint expressly cites and relies upon a written contract in support of a claim, the drafter of the complaint cannot prevent the court form considering the written contract in ruling on a motion under Rule 12(b)(6).").

To survive a motion to dismiss, a plaintiff must "state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be

3

enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (internal citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556). Despite this generous standard, "Rule 12(b)(6) is not entirely a toothless tiger . . . [t]he threshold for stating a claim may be low, but it is real." Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989) (quotation omitted). The complaint must therefore "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988); see DM Research, Inc. v. Coll. Of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999) (explaining that the complaint must "allege a factual predicate concrete enough to warrant further proceedings").

Although the complaint need not provide "detailed factual allegations," Twombly, 550 U.S. at 555, it must "amplify a claim with some factual allegations . . . to render the claim plausible," Iqbal v. Hasty, 490 F.3d 143, 157–58 (2d Cir. 2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

Though most motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) are "premised on a plaintiff's putative failure to state an actionable claim, such a motion may sometimes be premised on the inevitable success of an affirmative defense." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). "As a general rule, a properly raised affirmative defense can be adjudicated on a motion to dismiss so long as (i) the facts establishing the defenses are definitely ascertainable from the complaint and the other allowable sources of information, and (ii) those

facts suffice to establish the affirmative defense with certitude." Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 12 (1st Cir. 2004).

III.   ANALYSIS

The FLSA provides broad and comprehensive coverage of employees; indeed, the Supreme Court has suggested that "[a] broader or more comprehensive coverage of employees . . . would be difficult to frame." United States v. Rosenwasser, 323 U.S. 360, 362 (1945). However, the statute's reach is not without limits. The FLSA applies only to those "employees" who are "employed" by an "employer." 29 U.S.C. §207(a)(1). Hence, "[l]iability under the FLSA hinges on the existence of an employee-employer relationship." Chun Lin Jiang v. Shogun Japanese Steakhouse Inc., No. 21-11732-FDS, 2024 U.S. Dist. LEXIS 16768, at *6 (D. Mass. Jan. 31, 2024). Pharmscript asserts that McCatty has failed to allege facts plausibly showing that Pharmscript was his joint employer and, therefore, McCatty's claims against Pharmscript are subject to dismissal.

"[T]he remedial purposes of the FLSA require courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." Baystate Alt. Staffing v. Herman, 163 F.3d 668, 675 (1st Cir. 1998) (quoting Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991). An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An "employee," subject to certain exceptions not relevant here, is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "The FLSA contemplates several simultaneous employers, each responsible for compliance with the Act." Baystate, 163 F.3d at 675.

"[T]o determine whether an employment relationship exists for the purposes of [the FLSA], courts look not to the common law conceptions of that relationship, but rather to the 'economic reality' of the totality of the circumstances bearing on whether the putative employee is

5

economically dependent on the alleged employer." Id. In Baystate Alternative Staffing v. Herman, the First Circuit set forth four factors that are relevant to this analysis: "whether the alleged employer (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Id. The first two of these factors "address the extent of a putative employer's control over the nature and structure of the working relationship." Id. The final two factors "address the extent of a putative employer's control over the economic aspects of the working relationship." Id. at 676. "[I]t is the totality of the circumstances, and not any one factor which determines whether a worker is the employee of a particular alleged employer." Id. In Jinks v. Credico (USA) LLC, the Massachusetts Supreme Judicial Court adopted this analysis to determine whether an employment relationship exists under the Massachusetts wage laws. 488 Mass. 691, 703 (2021).

A.    The Power to Hire and Fire

McCatty acknowledges that he and the other couriers were hired directly by Stallion. (Docket #18 at ¶ 21). However, he argues that Pharmscript indirectly dictated which applicants would or would not be hired by setting the requirements couriers must meet to be hired, namely that the couriers must be appropriately licensed, drug tested, background checked, and have a suitable driving history. (Docket #18 at ¶ 27(j); Docket #31 at 9).

In Sigui v. M+M Communications, Inc., Cox contracted with M+M to perform installation and maintenance services on cable television, internet, telephone lines, and equipment for Cox customers throughout Rhode Island. 310 F. Supp. 3d 313, 319 (D.R.I. 2018) (Almond, M.J.). M+M provided these installation and maintenance services through M+M's Field Service Technicians. Id. While M+M directly hired the Technicians, the contract between Cox and M+M

set forth certain standards that a potential M+M hire must meet including passing a background check, drug screening, and identifying verification. Id. at 320. The court found that, while these standards impacted M+M's hiring practices, these specifications did not amount to direct or even indirect power over hiring and firing. Id. at 330. Instead, such specifications "amount to minimal quality controls and safety measures and do not indicate that Cox controls which applicants are hired or how many." Id. Thus, the court determined that this factor weighed against finding a joint employment relationship. Id. at 331; see also Godlewska v. HDA, 916 F. Supp. 2d 246, 260 (E.D.N.Y. 2013) (holding that city agency's requirement that company with which it contracted to provide home attendant services hired attendants that met specific minimum qualifications, i.e., "maturity, emotional and mental stability, experience in personal care or homemaking, literacy, certification of good physical health, a criminal history record check, and certain [approved] required training" comprising "forty hours of basic training, three semi-annual hours of in-service training, and on-the-job training as needed, did not amount to power over hiring); Lawrence v. Adderely Indus., No. CV-09-2309, 2011 U.S. Dist. LEXIS 14386, at *25-26 (E.D.N.Y. Feb. 11, 2011) (holding that where cable company entered into a services agreement with contractor to hire technicians to perform installation in its customers' home, cable company's requirement that all prospective technicians passed criminal background checks and drug screening tests prior to working on behalf of cable company did not indicate an employee/employer relationship; rather, "it is only good business sense for [cable company] to attempt to insure that the technicians sent to customers' homes are fit to enter those homes") (quoting Herman v. Mid-Atlantic Installation Servs., Inc., 164 F. Supp. 2d 667, 672 (D. Md. 2000)) (alterations omitted).

      This court sees no substantive difference between the hiring requirements Cox set for M+M hires and the Pharmscript hiring parameters for couriers. Clearly it is good business sense for a

company operating a pharmacy to ensure the couriers transporting its pharmaceutical products were appropriately licensed, not using illicit drugs, free of a criminal background, with a suitable driving history and further to ensure that they remain that way. Such hiring requirements amount to minimal quality controls and safety measures.

In support of his argument that Pharmscript was a joint employer of the couriers, McCatty alleges the following in his amended complaint:

> 37. Stallion has terminated Couriers for failing to comply with its and/or Pharmscript's instructions, requirements and specifications.
>
> 38. Upon information and belief, Pharmscript has directly caused/instructed Stallion to terminate Couriers.

(Docket #18 at ¶¶ 37-38). The court, reading the complaint as a whole, understands McCatty to be alleging that Pharmscript instructed Stallion to terminate couriers who did not meet its quality control standards. This allegation is not sufficient to find that Pharmscript had such an ability to fire couriers as to be a joint employer. Stallion had full authority to maintain the employment of couriers who met Pharmscript's standards; conversely, Stallion had the authority to fire any courier it believed should be fired even if that courier met Pharmscript's standards. See Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 689 (D. Md. 2010) (finding that cable company's ability to advise installation company with which it contracted that installation company's technicians who were not meeting cable company's standards were no longer authorized to perform installation work on behalf of cable company – in effect a "firing" – was done only in the context of quality control and did not weigh in favor of finding cable company an employer of technician for purposes of the FLSA).

Hence, the court finds that McCatty's allegations concerning Pharmscript's ability to hire and fire couriers weighs against finding Pharmscript is his joint employer.

8

B.      Employee Work Schedules and Conditions of Employment

In his amended complaint, McCatty alleges that Pharmscript developed and dictated the following requirements which Pharmscript and Stallion worked together to impose and enforce upon couriers:

    a. Requiring Couriers to obtain signed electronic receipts which include the signature of the consignee, signature time and date.

    b. Requiring Couriers to provide same day delivery of any return item to its origin or other location determined by Pharmscript.

    c. Requiring real-time tracking of Couriers.

    d. Requiring real-time reporting of pick-up and delivery of each product delivery.

    e. Dictating the types of vehicles Couriers were and were not permitted to use to make deliveries.

    f. Prohibiting Couriers from transferring any of the products being delivered to another individual to perform or complete the delivery.

    g. Prohibiting Couriers from simultaneously transporting property or persons for any other entity without Pharmscript's authorization.

    h. Requiring Couriers to comply with all delivery instructions, including any special handling, temperature and timing requirements.

    i. Requiring Couriers to report any delays and estimated extent of the delay.[3]

    j. Requiring Couriers to be appropriately licensed, drug tested, background checked, and have a suitable driving history.

    k. Dictating terms of agreements that Couriers entered into with Stallion at the time of the Courier's hire.

    l. Requiring Couriers to wear standardized uniforms with visible photo ID.

    m. Requiring Couriers to receive education and training related to HIPAA compliance and the handling and storage of medications and controlled substances.

---

[3] For any delay of a pickup or delivery in excess of sixty minutes past the required time, the Services Agreement requires Stallion to promptly advise Pharmscript of the delay and give an estimate of the extent of the anticipated delay in delivery. (Docket #26-2 at 4).

(Docket #18 at ¶ 27). This court agrees with Pharmscript that these allegations are in essence that Pharmscript supervised and controlled the couriers' work schedules and conditions of employment because the Services Agreement set forth "instructions, requirements, and specifications" as to how Stallion was to deliver its services to Pharmscript, with which its couriers had to comply. (See Docket #26 at 12). McCatty further alleges that Pharmscript directly instructed couriers: that additional stops would be added to their routes, to complete their routes in a different order without regard to the added burden on the courier, to return products at a certain time (often in the middle of the night), and that they needed to remain on the premises of the Pharmscript location until the product was ready for pickup. (Docket #18 at ¶ 28).

"[S]upervision and control is probative of an employment relationship only when the oversight demonstrates effective control over the schedule and conditions of employment." Jacobson, 740 F. Supp. 2d at 690. "A high level of supervision and control is not an automatic trigger for joint employment." Id. Instead, it is "[t]he nature of the control [that] distinguishes employment and contractor relationships." Id. at 690-91.

This court finds the opinion in Herman v. Mid-Atlantic Installations Services, 164 F. Supp. 2d 667 (D. Md. 2000), instructive. There, Comcast, a cable company, entered a contract with MAT for installation service. Id. at 669. The contract between Comcast and MAT had strict specifications regarding technical standards and quality control, the fitness of installers, and the timeliness of delivery of services. Id. at 669-70. MAT in turn hired individual installers to do the actual installation work. Id. at 669. The contract that the installers signed unambiguously stated that the relationship between MAT and the installer was that of independent contractor/client. Id. at 669-70. The installers received job orders from MAT to install or repair the Comcast cable equipment in the homes of Comcast customers. Id. at 670. MAT assigned routes to the installers

10

and imposed upon them via their contracts the same requirements of timeliness, expertise, and compliance with technical specifications that Comcast imposed upon MAT. Id. While on the job, the installers were required to wear MAT-approved uniforms, attach signs to their own trucks which stated "Contracting for Comcast," and wear ID badges identifying themselves as Comcast contractors associated with MAT. Id. Installers were required to provide service within a four-hour window and were required to check in regularly with MAT's dispatcher. Id. at 670, 672. Suit was brought by the Secretary of Labor on the installers' behalf alleging that the installers were actually employees of both MAT and Comcast under the FLSA. Id.

The court initially addressed whether the installers were employees of MAT, as Comcast could only be considered a joint employer if MAT was also one. Id. at 671. While the court noted that, on their face, the facts of the case appeared to demonstrate substantial control by MAT, upon careful review it was apparent that MAT did not exercise that type of control necessary to label the installers employees. Id. at 672. In so holding, the court determined that "requiring the [i]nstallers to meet MAT's and Comcast's installation specifications [was] entirely consistent with the standard role of a contractor hired to perform highly technical duties" as "[i]t is in the nature of a contract that the contractor promises to deliver the performance bargained for by the client." Id. "In short, requiring a contractor to meet the client's technical specifications is not the type of 'control' which bestows 'employee' status on the contractor." Id. at 673. The requirement to wear uniforms and badges identifying their affiliation with MAT also did not transform the installers into employees because the requirement did not affect the installer's "economic dependence on or independence from MAT in any way, but merely allows consumers to be assured of their *bona fides*." Id. at 673. The fact that MAT established procedures to ensure that installers would service customers within a four-hour window stemmed from the nature of the business and the need to

11

provide reliable service and convenience to consumers, not the nature of the relationship between MAT and the installers and thus did not support a conclusion that the installers were MAT's employees. Id. at 674; see also Franco v. Roman's Commer. Cleaning & Prop. Maint., Inc., No. 16-225-WES, 2018 U.S. Dist. LEXIS 90532, at *9 (D.R.I. May 31, 2018) ("Supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting relationship.") (quoting Jean-Louis v. Metro. Cable Commc'ns, Inc., 838 F. Supp. 2d 111, 126 (S.D.N.Y. 2011)) (alterations omitted). While the need to regularly report in to the dispatcher indicated a certain degree of control over the installers by MAT, it was insufficient in and of itself to transform the relationship between the parties into that of an employer/employee. Id. This was so even though, unlike Pharmscript, MAT assigned the routes installers worked. Id. at 673.

The putative employer cable company in Jacobson v. Comcast Corp. monitored the technicians of the installation company with which they had contracted at a higher level than MAT did of the installers in Herman. In Jacobson, the cable company utilized a program which permitted it to exercise real time monitoring of a technician's work. Jacobson, 740 F. Supp. 2d at 687. The cable company regularly monitored the location of the technicians to determine where they were, how long they were on a site, and what equipment was utilized; specified the times at which they were supposed to arrive at appointments; and regularly evaluated their completed work to ensure that it met standards. Id. at 687, 691. Though typically the cable company would forward batches of service calls to the installation company, at times the cable company would contact technicians directly to point them to particular jobs. Id. at 687. The court concluded that "[w]hile [the cable company's] supervision and control may appear substantial in degree, it is qualitatively

different from the control exercised by employers over employees." Id. at 691-92. Instead, the cable company's "quality control procedures ultimately stem[med] from the nature of their business and the need to provide reliable service to their customers, not the nature of the relationship between the technicians and [the cable company]."

With these cases as a guide, the court concludes that McCatty has failed to allege that Pharmscript exercised the type of control over the courier's work schedules and conditions of employment indicative of the employer/employee relationship. McCatty does not allege that Pharmscript assigned specific couriers to certain routes or required specific carriers to work certain shifts. See Moreau v. Air France, 356 F.3d 942, 950 n.5 (9th Cir. 2004) (finding for purposes of joint employment analysis that airline did not control schedules of contract personnel servicing planes on the tarmac where airline scheduled its flights into and out of the airport, "which necessarily indicated when the services were to be performed," but contractor "remained responsible for designating which employees would report to service the aircraft"). While Pharmscript may have increased courier work hours by adding stops, requiring a certain order of delivery, or requiring couriers to remain on Pharmscript's premises until a product was ready for pickup, such incidental impact on the couriers' work schedule is not the type of control exercised by an employer over an employee. See Layton v. DHL Express (USA), Inc., 686 F.3d 1172, 1178 (11th Cir. 2012) (finding that putative employer's occasional erratic pick-up orders which resulted in drivers working longer hours was not the type of control over work schedule exercised by employer).

"Quality control and compliance-monitoring that stem from the 'nature of the business' – that is, from the nature of the goods or services being delivered – are 'qualitatively different' from control that stems from the nature of the relationship between the employees and the putative

13

employer." Godlewska, 916 F. Supp. 2d at 260 (quoting Jacobson, 740 F. Supp. 2d at 691-92) (alterations omitted). Pharmscript contracted with Stallion to provide courier services for pharmaceutical products including controlled substances. (Docket #26-2 at 2). These products required certain handling with respect to temperature and it was expected that some of these products would diminish in effectiveness if delivered late. (Id. at 4). "[T]o ensure security of the product being transported, chain of custody and proof of delivery," Pharmscript required Stallion to use an electronic tracking system. (Id. at 7). "For security reasons," Pharmscript also required all couriers to be in standardized uniforms with photo IDs visible. (Id. at 5). "Due to the nature of the pharmacy business," Pharmscript required Stallion to ensure that all its personnel who came into possession of Protected Health Information must comply with all requirements of the Health Insurance Portability and Accountability Act (HIPAA). (Id.). Here, as in Jacobson, the control procedures alleged ultimately stem from the nature of Pharmscript's business and the need to provide reliable and safe service to their customers, not the nature of the relationship between the couriers and Pharmscript. See Godlewska, 916 F. Supp. 2d at 261 (finding that putative employer's monitoring of contractor's compliance with the law and ensuring quality service to patients, stems entirely from the nature of the business of providing heavily regulated, government-funded health services to patients in their homes). Hence, "it is qualitatively different from the control exercised by employers over employees." Jacobson, 740 F. Supp. 2d at 692.

C.    Rate and Method of Payment

Per the Services Agreement, Pharmscript contracted to pay Stallion per delivery and/or mile. (Docket #26-2 at 3). The Services Agreement is silent as to the rate that couriers are to be compensated. In his amended complaint McCatty makes the following allegations with respect to Pharmscript's control of the rate of payment of himself and other couriers:

14

> 39. Upon information and belief, Pharmscript has developed the payment structure utilized by Stallion to compensate the Couriers.
>
> 40. More specifically and upon information and belief, Pharmscript developed a compensation structure pursuant to which all Couriers were paid a certain amount per mile plus an additional amount per delivery.
>
> 41. In practice, Couriers are offered delivery routes that they have no meaningful opportunity to negotiate with compensation ultimately [determined] by Stallion based on the parameters established by Pharmscript.
>
> . . .
>
> 43. Couriers are also subject to the same deductions that Stallion deducts from their compensation, including a tech fee, motor carrier authority fee, and IC program fee, which upon information and belief are costs for Stallion to comply with Pharmscript's requirements, that Stallion passes on to the Couriers.

(Docket #18 at ¶¶ 39-41, 43).

In evaluating the allegations in the amended complaint, the court "must draw on [its] judicial experience and common sense and read the complaint as a whole." Webb v. Injured Workers Pharm., LLC, 72 F.4th 365, 373-74 (1st Cir. 2023) (alterations omitted); accord Wiener v. MIB Grp., Inc., 86 F.4th 76, 85 (1st Cir. 2023). Reading the amended complaint as a whole and taking into account the Services Agreement, the court finds that McCatty has alleged that Pharmscript developed a payment structure, memorialized in the Services Agreement, by which it would compensate Stallion; Stallion ultimately determined the courier's compensation based on the parameters established by Pharmscript in the Services Agreement; the couriers' compensation was based on mileage plus an additional amount per delivery; and Stallion subjected the couriers to compensation deductions to cover the costs of Stallion's compliance with Pharmscript's requirements. Distilled, McCatty alleges that Pharmscript controlled the rate of the courier's payments because it paid Stallion on a per mile plus delivery basis and Stallion, in turn, paid the couriers on a per mile plus delivery basis and because Stallion passed on to the couriers, in the

15

form of deductions from compensation, the costs Stallion incurred from complying with Pharmscript's requirements.

In <u>Jacobson v. Comcast Corp.</u>, discussed *supra*, a cable company contracted with an installation company which, in turn, hired technicians to perform installations. 740 F. Supp. 2d at 686. The plaintiff technicians argued that the cable company exercised control over the installation company's pay structure because the cable company paid the installation company on a per service basis and the installation company, in turn, paid their technicians on a per service basis. <u>Id.</u> at 692. The court rejected this argument and instead found that the cable company's involvement in the pay structure of the installation company was typical of any client/independent contractor relationship and that to find otherwise "would dramatically expand the FLSA to subsume traditional independent contractor relationships." <u>Id.</u> The court noted that "[a]n employee's income, received from its direct employer, will always be determined and influenced by what a contractor decides to pay the direct employer for services rendered by the employee." <u>Id.</u> (quotation and alterations omitted). That any costs incurred by the direct employer in complying with the contractor's requirements would also influence an employee's income flows logically from this maxim.

This court finds the reasoning in <u>Jacobson</u> persuasive and thus determines that the rate and method of payment weighs against a finding of joint employment.

D.   Employment Records

McCatty alleges that Pharmscript maintained "records showing the miles driven by Couriers, and, in part, records showing hours worked by Couriers, which includes stop level detail in an excel file[] for all Couriers."[4] (Docket #18 at ¶ 48). He asserts that the only inference that

---

[4] The Services Agreement defines a "stop" as "the unique delivery or pick-up address of a Shipment." (Docket #26-2 at 3).

can be made by the allegations of the amended complaint is that Pharmscript used these records to control the courier's day-to-day employment. (Docket #31 at 15). The court does not agree. As set forth in the Services Agreement, Stallion's compensation was based on mileage plus an additional amount per delivery. (Docket #26-2 at 11-17). To apply this formula, Pharmscript would necessarily need to determine the miles and stops completed by the couriers. See Sigui, 310 F. Supp. 3d at 38 (holding that maintenance of records of information needed by cable company to make payment to company with which it contracted for installation services and records needed to ensure customer safety did not weigh in favor of finding cable company a joint employer of installation company's technicians). The court finds that this factor weighs against a finding of joint employment.

Hence, having applied the four Baystate factors, the court determines that McCatty has failed to allege an employment relationship between himself and Pharmscript.

IV.     CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that the motion to dismiss (Docket #25) be ALLOWED.  In light of this recommendation and the court's separate ruling on Stallion's motion to dismiss and compel individual arbitration, I further RECOMMEND that the motion to certify class (Docket #15) be DENIED AS MOOT.[5]


/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[5] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).